Case number 09-0149, Bernstein & Grazian v. Grazian & Volpe. You want to step up? Please identify yourselves. Both sides step up. You're going to be given an order. We're going to give you 20 minutes per side, considering the fact that you have a cross-appeal. Justice Smith has some comments as well. Here's a document for each of you, and then I'll explain it to you. Basically, it's come to our attention that there may be a basis on which this case, the case does not have standing here under jurisdiction. So as a result of that, we're giving you the opportunity to brief it and have it done by the 19th at 3 o'clock. And you also will have the opportunity to respond by next Wednesday at 3 o'clock. And there won't be any consideration of extensions, because for all practical purposes after today, we'll be knowing basically what we're doing if you manage to withstand that issue. Okay, may I just ask, is this based on the fact that the appeal was dismissed and then reinstated? Yes. Okay. Yes. Okay. So that shouldn't be long, but we have to clarify it, because if we don't, the Supreme Court will. Okay. Okay. And with that, we might begin. I'm Leslie Rosen. Yes. I'm on behalf of the State of Isidore Bernstein and the law firm of Isidore Bernstein and Grayson, D.C. I also have one more question in advance of 20 minutes. Would you like me to just give my argument first on my appeal, and then we're going to go one, two, three, four, or just try it? Handle it any way you wish to. Okay. Whatever you two agree to. I'll go do everything first and take one reply. And I guess he'll get the last word on this reply. Okay. Well, my brief is very short and very simple. I have one main argument, and that is that the trial court erred as a matter of law in using quantum Merowith as a method for determining who got what fees from this professional corporation. There's never been a case in Illinois doing that. This is not a quantum Merowith type of case. This is a case of a law firm breakup. Quantum Merowith is applied every day of the week in cases where a client hires an attorney, a new attorney comes in and settles a case, and they fight about, you know, how the fees are to be distributed. This isn't that kind of case, and for a good reason it's never been applied in a partnership breakup. It would be ludicrous to do that. This is a case where the law is clear that it's to be divided by the method, by the ownership of this professional corporation. The court recognized it. It said, yes, I recognize the case of Suffren v. Hosier. It gave the site. The court then divided the costs pursuant to that, gave Mr. Bernstein 50% of the costs, but then only 10% of the fees. I can understand how that happened. It was a difficult trial, very difficult trial, where Mr. Bernstein was subjected to a long examination, and he was a very elderly man. There was no question about it. Sixty-seven is elderly? No, he practiced law for 67 years. He was over 90. All right. But when Mr. Grazian came to work for him, he was 84. That's very unusual. There are very few people practicing law in their 90s. Mr. Bernstein loved the law, and he was a peculiar, different kind of lawyer as it came out in the trial. He went to court once in his career, didn't like it, didn't go back. It's astonishing, actually, that he was able to go on for so long. But he practiced until the day he died almost. He was a man who brought the business in as the testimony came in. His job was to interview the clients, take in the case, answer interactory. He always, always had somebody else doing the actual trial work. That was the way the practice functioned. That was the way the practice functioned when Mr. Grazian came in, and that was the way the practice functioned when Mr. Grazian left. In the nighttime, with the stuff, with all the equipment, he came in on the first night of Passover when Mr. Bernstein left the office and brought six to eight people, and they pulled the stuff out. In this case, Ellerbee, which is what Sufrin is based on, says, we don't want that in Illinois. We don't want to encourage this kind of behavior. Was that your theory in the trial court? Did you rely upon Ellerbee? No, never mentioned it. Why do you have standing to argue it here? It's not a question of standing. I don't believe. But why can I argue it here? Why isn't there a waiver? Okay, we didn't forfeit that issue for a number of reasons. It was always Mr. Bernstein's position that he was entitled to 50%. If you go to volume 13 of the record and you look at the motions that were argued before the trial, this was June. The trial was in December. He said, I want 50%. Defendants said he wants 50%. Is it 50% or 70%? You go both ways. I do go both ways as an alternative. I'll go for it. But you waived both those arguments. You waived them both in the trial court, didn't you? No. That's what your opponent is saying. I don't care. I mean, that's not true. 70% I didn't argue. We didn't argue. There's no question about that. But as the court knows, waiver is a limitation on the parties, not the court. And actually, I was at a seminar two weeks ago with Justice Tyson. She said, the court is now saying forfeiture. Don't say waiver anymore. She said it 10 times. But 70% we didn't talk about. But it was thoroughly consistent from the beginning to the end, opening three times on the motions. If you look at volume 13 of the record, I believe it's at pages 103, 110, and 115. Three times, counsel says, I want a constructive trust for 50%. He didn't say the words. He brought in the case Suffren, however you pronounce it. And the court held in June, there's no basis for us growing 50% of the fees because that's what Mr. Bernstein was asking for. But he didn't want 50% of the cost of the expenses, did he? Sure he did. He did? He got 50% of the cost of the expenses. No, not according to the record. Not according to the defense. No, not according to the record. If you look at the record carefully, in the $900,000 of the two-thirds that was expended by Grazie and overhead and expenses, Mr. Bernstein did little or nothing. So my question to you is, his 10% was actually a gift, I think. I don't think so. Because if you take $900,000 for the year 2000, I think it was four or five, and you subtract it from anything he brought in, that's a minus condition. What do you mean? I'm sorry. Over two-thirds of the expenses and overhead on the files that were not completed came out to $940,000. Now, if you offset that versus what he alleged he wanted, the 50%, and you offset each against the other, that comes out to about 10%. You know, that was not discussed by the trial court. That was not pursued by defendant in the case below, because below all he was yelling was quantum merit, quantum merit, quantum merit. Oh, that's what I'm saying. But overhead. The quantum merit is the 10%. No, but that's not 10%. That's not quantum merit. Quantum merit should never have been discussed in this case. It had no place here. My feeling is if you are correct, and I don't agree with you. Well, I ended up the figures in the record. Well, in the record. For some reason, and I'm kind of assuming that that's how the judge came to quantum merit. That's not what the judge said. No, no, but I'm saying I think that's how he got there, because he had to base it on some number. No, he didn't base it on that. What he based it on, he said that Mr. Bernstein had become a liability to the firm. I think that I would speculate, because I think that's all you can do on this record. I would speculate that he was feeling kindly to give the guy something, because he was old and he looked very bad on this record. I mean, he was just trying to give him something to make it look fair, because there was no discussion ever of the overhead. So you did the trial level too? Pardon me? You were the trial attorney too? No. No, if I was at the trial level, I would have strongly urged summary judgment. You would have argued more facts into the record, I suppose, too. Fewer facts into the record. Fewer facts. Well, fewer facts, yeah, I get you. I think it's a matter of law. This doctrine, it was just screwy, because this is not a case for quantum merit. Any way you cut it. If the court feels firmly that the numbers don't add up right, then it could be remanded for a hearing on overhead and expenses. But the way I see it is that prior to the breakup, overhead was paid as it was by agreement, you know, with the three guys each splitting one-third, one-third, one-third. But according to the record, that isn't how it's coming out. That is the testimony, that they were paying one-third on each. And then afterwards, Mr. Gracian and Mr. Volpe paid their own overhead. Mr. Bernstein paid his own overhead. And the costs that were recovered, which I would assume would be all of them, for these files were split, were returned 50-50. That's what the judge did. Okay. I have to, frankly, I don't, I can't answer all your questions. I don't understand your calculations. I just took the numbers that were there. But go ahead. I mean. Yeah, I could, I need to see that better, quite honestly, because the way I see it, overhead was split appropriately. What's more important than understanding Justice Smith's calculations is understanding your calculations. My calculations. And your clients, yes. My calculations are you go to the second agreement, the second agreement. The second agreement was not a complete agreement. You're talking about the agreement of 2005? It's 2005. 2004. It's in my brief in the appendix, I believe, at A18. And it says, John and Isidore will split all litigation expenses on the personal injury cases files only equally as of 2103. John and Isidore will split all fees received on personal injury case files as of 2103 on a 50-50 basis. What are you talking about now? It's at page A18 of my appendix in my brief. It's the agreement. It's the handwritten. The handwritten. I believe that to be a complete agreement. And then it says that everything else goes with the other. So the partner, then it says the partnership agreement. This was in 2003. Right. The breakup was in 2005. I just asked. It said 2005, and you said it was 2004. This was the earlier agreement that they had. No, no. There was an earlier agreement. If you go back to A16, there was an earlier agreement. The earlier agreement was that Mr. Bernstein paid Mr. Grayson. Which earlier agreement? What date are you talking about now? Fourth day of March, 1998. It appears in my appendix at A11. That's the first agreement. That's the first agreement. I'm sorry for any confusion. The first agreement was when Mr. Grayson came to work for Mr. Bernstein as an employee, was paying him $100,000 a year, and they became partners of sorts, and Bernstein had 70% of the shares of the stock, and Grayson had 30. That's the first agreement. And then it turned out that Grayson felt, appropriately perhaps, I'm sure, because he did a lot of work, that he should get more money. And so they then came to a second agreement, which is at A18, that's handwritten, and that's in 2003, I believe. Not 2000. 2003. February 1st. And there they say, we're going to split all costs 50-50, and we're going to split all fees 50-50 on the personal injury cases. And Mr. Bernstein made the same agreement with Mr. Volpe as to the workers' comp cases, which are not before us. Okay. Now, let me follow through on that. Subsequent to that, we have Mr. Bernstein starting his own business, okay? He incorporates the new, yes. So then, at the same time, the balance changes because Mr. Bernstein is spending more time on his business, and the numbers of what he brought in or performed, however you define it, went down from something like 200 to 80 to 800. Now, that's their perspective. You have to remember, Mr. Bernstein was over 90 years old. You don't know why things changed. The climate changed, too, in the personal injury world. But doesn't that alter the balance of what is reasonable? No. And reasonable doesn't mean anything here in a certain regard because they have a written agreement, and they could have controlled it. But timeout. Is it not a breach of the agreement then? No. Because he's not doing his performance. No. Because when Mr. Grazian came in, in the middle of 1990s, there was an understanding, and it says so in the first agreement of 1998, the first one, that Mr. Grazian isn't going to do any malpractice because Mr. Bernstein always had malpractice. There's no showing in this record as to how much. Their breach says that he had a few cases, but there's no showing. There's no evidence in this record as to how much that was. Mr. Bernstein always had that business, and he always referred it out, and that was the understanding. They could have controlled anything they wanted in this agreement. They chose not to do any more. In this agreement of 2003, it was Mr. Grazian's. That's Mr. Grazian's agreement, that he wanted it written down. He wanted the changes written down. The burden should be on him if he wanted to change anything else. But that was always the case, that Mr. Bernstein was doing that. This record is absolutely silent as to what was going on, as to why Mr. Bernstein's efforts produced less money. Well, tell me about Mr. Bernstein and the termination, where you indicate it's a winding up, and they're indicating it's an end. What's the difference here? There's a partnership that's never ended. Well, that depends on how you read Ellerberry and how you read Suffern and Fox and Jewell. But if you take those, they all say that the expenses and overhead are a consideration, whereas in Ellerberry, you're arguing the expenses and overhead are not. Well, I'm arguing that the contract under Ellerberry and under Suffern particularly, I'm arguing that the contract controls here. And especially if you look at the end of Suffern, when they talk about the defendant's arguments as to why it wouldn't be right to have anything but quantum error would apply. And they say, you controlled this, buddy. This was yours. It was Judge Duff. And here, this is what they agreed on. At the most I'd ever concede in this case is there could be a remand on that for parties to put in evidence on that point, because there was none. I mean, there's records, but I don't think the evidence, I don't understand. Well, that's not your fault, but it's the fault of the attorney that represented it. That it's not there, that it wasn't as slushed out as it should have been. But I believe this controls on page A18 of my appendix, that that's it. I would say he was consistent. He argued, again, for 50% of his closing. So he didn't waive anything or forfeit any issues. You're here to review the judge's ruling, not his reasoning. But the judge did recognize that suffering was the case, and he just chose not to go with it. He just said, no. So I'll move on quickly to why defendant's arguments are invalid. Mr. Bernstein didn't just simply withdraw here. The evidence was on both sides here that Mr. Bernstein thought that the agreement was forthcoming, so he signed those letters, and he wasn't going, you know, he wouldn't have signed them if he didn't believe that this wasn't going to be worked out first. They weren't dated. There's contradictory evidence, plenty of it, but not enough to say that there was a breach there, a fiduciary duty, or that he just withdrew and that quantum merit applied. Even if he did withdraw, however, according to Suffren, it doesn't matter. It's still the professional corporation's assets, and they should have been split pursuant to the agreement. And I'll point out again, defendant cites no cases where quantum merit is applied. None. There are none anywhere where quantum merit is applied to the breakup of a partnership or a legal partnership or a PC involving lawyers. The one case involving a joint venture is totally distinguishable. A joint venture is something that's formed for one effort, one effort only. I can say this wasn't a competing business that he started. He did incorporate differently, but it wasn't competing. A competing business would be if Mr. Bernstein started a different firm in the same place that was seeking personal injury and workers' comp. So how do we write around if I say, they're going to tell me that that's a breach, and it's a breach because it increased what was done during his hours and his time, which decreases what he has contracted to perform. So how do I get around this? Bernstein says he was 5% of his time. But second of all, Bernstein was there six or seven days a week. This was the love of his life. He was always at his office. Nobody will tell you otherwise. And Grayson wasn't required to be there. I'm interested in your representation. You say that there are no cases that the defendant has relied upon that stand for the proposition that quantum merit was properly used here? Yes. The cases all cited involve situations, the typical situation. Well, on page 37 of their brief, they cite one, two, three, four cases dealing with where there's a withdrawal of representation by counsel, which is what we seem to have here. No. Those are cases where a substitution of attorney or somebody new comes in. There's not a single case cited where there's a partnership, a partnership and one takes over. You always have cases where, you know, lawyers fire their attorneys and a new person comes in. Well, wasn't D&G going to go out of the representation of these clients? That's why the substitutions were filed. Yes, but they were. That's what they did. That's what they did, right. But those cases still were unfinished business of the corporation. And just because they withdrew doesn't mean that it was finished business of the corporation. It was still unfinished business. Mr. Grazian recognized that. He offered Mr. Bernstein a third before it came to a lawsuit. Bernstein was entitled. Those were the cases he brought in. Bernstein's work did not change significantly. Maybe the climate changed with insurance companies, you know, not willing to settle cases upon a phone call anymore. Or maybe Mr. Bernstein wasn't capable of making those phone calls. I don't know. There's nothing, you know, on the record they say both things. They say both that Mr. Volpe says Mr. Bernstein was incompetent. But on page five of the APLE reply brief, the defendant says that Bernstein was a very capable 90-year-old attorney. You know, so if he was a very capable 90-year-old attorney and he was spending seven days a week at the office and only 5% of the time he was spending on the Met Mail, you know, he was not giving less of his time. He was just unable. I mean, hey, I'm working as much now as I was last year, and you know what? I'm not bringing in as much money. That's the way of the world. I'm sorry about it. But things change. The economy changes. The climate changes. So there's no evidence here. Anyway, and I did, there was no competing business, and finally, if you don't like the majority view, I think you're left with the minority view in this case of what should have been done, and we didn't argue it below, I know, is that the use of the corporate law in Illinois gives Bernstein 70%, and that's under Chapter 805, Illinois Statutes 5-12.30 sub 4. That says distributing its remaining assets among its shareholders according to their interests when you're dissolving a professional corporation, and that's what was happening here, and Bernstein had it. As to the cross appeal, if I have any time left. You may proceed. Okay. You know, the manifest, these are factual questions on defendants' cross appeal, if the cross appeal is good as to the fiduciary duty if he breached it. There was evidence both ways, and that's enough. You know, I don't think that merits a lot of attention. As I've said repeatedly here, there was only 5% of the time devoted to MedMail, he says. The secretary said otherwise. Grazian said otherwise, but, and the MedMail was not a competing venture. As to the merits of the, there was no basis for the 10% even on the quantum narrow it. First of all, I don't believe, and I won't belabor it, but I don't think that the notice of cross appeal indicates in any way, shape, or form that they're going there. They say in their notice of cross appeal they want you to vacate the findings on fiduciary duty and the breach of contract, but not that the way they calculated was against the manifest way of the evidence. But even if so, as I've said, 10% would not be against the manifest way of the evidence. It wasn't Bernstein's burden to prove anything on that. That wasn't his theory of the case. They're saying in their brief, well, Bernstein didn't show what his hourly rate was. Bernstein didn't show how much time he spent. That wasn't Bernstein's job. He didn't believe that was at all relevant. So that's the end. Any further questions, I'll sit down. Thank you. Thank you. Counsel, could you repeat your name again? Yes, Your Honor. Brian O'Connor. I may have pleased the Court. Good night. I respectfully disagree with counsel on just about everything counsel stated, but let me start out with the waiver. The LLB case that counsel relies completely upon specifically applied the waiver rule against one of the parties of that very case by stating point blank that any theory not raised in the trial court is waived. And it would be prejudicial against my client to do otherwise in this circumstance, and this ties into why LLB doesn't even apply to begin with. But at trial, they did not even contemplate LLB or try to apply this handwritten agreement. They wanted 50% flat out of everything. Only after they held a gun to Grazian's head by mounting this massive malpractice business, which I'll get to in a second. But there was never any mention by the plaintiffs about overhead. And, Your Honors, if you look at the LLB case, it's very clear that partnership profits are not the entire amount of the fees it earns. It talks about overhead, and it talks about liability to other creditors. Yes, we did off our side did put in some evidence about overhead, but there are other liabilities like paying a mortgage on a facility and everything else, which is what leads me to why LLB doesn't even apply in this case. And why, quite frankly, to assert it in my humble opinion, it's sort of outrageous under these facts. We have a situation here where an individual, although it's poo-pooed by counsel here, mounted a massive medical malpractice phone-in business that completely disrupted the operation of a high-volume personal injury practice. And that evidence is basically uncontroverted, despite what Mr. Bernstein says about percentage ways. How do we know that? We look at the secretaries who were with Mr. Bernstein for years. Both of them came in and point blank and explained in the record, which Your Honors can see, about how unbelievably disruptive this was. Number two, we can look at the dollar amounts. The evidence in the record showed that Mr. Bernstein did, and the firm rather, had some advertising over, I think, in 0-2 and 0-3. And in 0-3, they spent about $80,000 and generated all kinds of new cases, which overwhelmed the firm, which is why, in our theory, our evidence was that Mr. Grazian asked Mr. Bernstein to stop, to get a handle on these cases. Yes, there were a handful of malpractice cases. Nobody's denying that. Nobody's ever denied that. And those were not handled within the firm. The handful that Mr. Bernstein got prior to undertaking a separate business were referred out. But we're talking about a handful of cases, which is the undisputed evidence in that record. Now, afterward, he starts spending, starts a separate corporation, spends in 0-4 about $250,000, and then 0-5, $350,000. Thousands of dollars in advertising. One lawyer alone, Mr. Goldstein, received phone referrals of about 453 files. The secretaries testified that Mr. Bernstein would interview these people and dictate summaries. And the girls in the office, there's only two of them in this little firm, have to do it, have to type out these summaries and send them on to Mr. Goldstein. In addition, he is referring cases out of state to who knows where. Indiana, Wisconsin was in the record, also downstate Illinois. The point is, Judge Ellerbee was never, ever meant, ever meant to apply to a situation where a lawyer or a partner, if you want to call it number one, decides, well, I'm just going to up and do my own business, and ah-ha, I'm still going to get 50 points less expenses from this other stuff. You maintain that. And counsel says that Mr. Bernstein brought in the personal injury case. Well, that's just not true. That was true when he hired John Grazian back in the 90s. But this John Grazian, and this is all in the record, was a trial lawyer, and he developed a rapport with the clients. Yes, some came in by advertising, but many were repeat based on being handled by Grazian over the years. So it's not accurate to say that Bernstein was bringing in all the business. Ellerbee was never meant to apply to a situation where partner one abandons its firm. Here's another point, Your Honors. The court, and I agree with the court's impression of where that 10% came from, because that's how the numbers worked out. But in the court's finding, it made a very specific finding that the contract that the court was trying to ascertain was the professional corporation. In Ellerbee, there's a statement at, I don't know what page, I guess it's page 83 of the appellate report or citation. But it says, quote, since there was no showing that the partners agreed to change the distribution of profits after dissolution, and that Spicer, that was a defendant, waived his contention, blah, blah, blah. Then the distribution formula in effect at the time of dissolution remains in effect. Let me state that again. The court, Judge Mackey, found that there was an agreement to change the dissolution scheme or that handwritten agreement. The thing was Bernstein reneged on it. So there was no clear-cut agreement. There was a clear-cut agreement to terminate, because we can see that. He signed a million or hundreds of substitutions. They sent out letters. He sought court orders. The secretaries testified. This was all above board. Everybody knew it. In fact, Mr. Bernstein, according to the secretaries testified, you're going with Grazian and Volpe, and you're going to take this furniture, et cetera, et cetera. Why in heaven's name? I mean, why would Mr. Grazian ever say you're going to get 50% of these files, the fees from these files, that we're taking, when before it was 50% less case expenses and less overhead? It just doesn't make any sense. And the court properly found there was an agreement to terminate this arrangement, this operation. That was the agreement that he was struggling. He articulated, the court articulated, the 10% based on quantum merit as to what Mr. Bernstein was entitled to. But by the language in Ellerbee itself, that ends the application of Ellerbee, not to mention Waver. Another thing, Your Honor, this, you know, if we read these cases closely, like that Suffren decision that Judge Mackey mentioned that counsel referred to, that Suffren decision, if you read it closely, looked at California law principles underlying why this Ellerbee type formula should be applied. And in those California cases, they talk about that even after dissolution, now we're saying the thing is terminated, but even after dissolution, if you're in the windup, there's a fiduciary duty that both partners owe. Well, Bernstein clearly didn't want any part of that. You know, if he wanted to, if they wanted to apply Ellerbee, where was the cost being tendered? During the few years that litigation was ongoing, these guys are working their tails off to try to generate a few dollars from a high-value law firm. That's the outrage of this whole thing. And another thing, and this does not show up on any of these cases, but I think we're all lawyers, we have to think about this in this kind of context. How can anybody, just because they have a law license and can put out some ads there, generate legal fees? And there's something manifestly wrong about that if you look at this record where an individual, and I mean no disrespect to this man, but he clearly was not, from an attorney perspective, not a mental perspective, he surely was mentally competent if he could hack this scheme with the malpractice case, but from a lawyer's perspective, he was not competent and he was not responsible. And I'm not saying that, you know, Ellerbee talks about, well, you can't really apply all those provisions of the Code of Professional Responsibility to these partnership contexts. I'm not saying that. But you have to be, as a lawyer, you've got to be competent as a lawyer to handle a case and be responsible before you're entitled to a fee. And I think Judge Mackey was struggling with all those things. So just to repeat myself, Ellerbee is clearly waiving that by the decision's own terms. What about Jewell and Fox? Well, those are the two California cases, Judge, neither of which applied waiver because that didn't come up. But that Jewell case does support our position in this respect. They talked about fiduciary duty. If you do think this is a dissolution and a wind-up, and we think it's a termination and just a fee issue, but if you do feel it's a dissolution and a wind-up, both parties have to have a fiduciary duty to those clients after that. I mean, they'd have to because what other basis would there be to give fees? And here, Bernstein clearly didn't want anything to do with the cases after the termination. And we presented evidence of a third, a flexible one-third fee arrangement, which he reneged on. And, you know, again, that gets back to this waiver principle. You can't just say I'm going to attack this case on one perspective and then if I lose it's too bad, I'll just fall back on appeal to Plan B. That's just not fair. In your brief, you stress waiver as to two of the primary arguments of Bernstein. Does the Metropolitan Condo case really address these allegations? That dealt with the scope of the notice of appeal, not the issues that were raised at the trial level. I totally agree, Judge. I don't think that was the greatest cite, but I think the ‑‑ That was Judge Mackey's case, by the way. It was? I didn't know that, but I agree with your Honor's point. But I do just repeat from LRB, because LRB would have been the case to cite, I can see why we wouldn't, why whoever wrote our brief wouldn't necessarily want to cite LRB because we're opposing LRB in principle. But the waiver point is quite clear. Page 80 of the LRB decision, if it's not raised at the trial court, it's gone. Not fair. And they prevented one of the parties from doing just what counsel is trying to do here. So I rely on that limited extent to LRB, and they cite other cases, Your Honor, down the swimming pool, a couple of other sites within the LRB decision. Now, if I may, so just to repeat myself real quickly, we claim that we believe there's a waiver here, but barring that, LRB doesn't apply to a situation where an attorney, a partner, if you will, abandons everything, starts a competing law practice. Secondly, the trial court found that there was an agreement to end this operation. It just couldn't come to grips as to exactly how much money to give based on the evidence. And three, in my opinion, three, the fiduciary duty aspect of it, and four, my opinion that you have to be competent as a lawyer and be responsible to earn fees on the order that they're seeking. Now, I do respectfully disagree with Judge Mackey on the breach of fiduciary duty. I do feel that the manifest weight of the evidence clearly shows that, and even by Mr. Bernstein's own admission, shows that he breached his fiduciary duty, even to the limited extent that he claimed. You can't, and I've never seen, I've never even heard of this, you can't operate as a law firm, a partnership, and decide, well, I'm going to have a separate law practice that's going to, counsel says, well, it's not really competing because it's not the same types of cases. Yes, it is competing because you're taking the same resources. This isn't, you know, Jenner and Black. This is a little office on 63rd and Central, a couple, three lawyers and a couple of secretaries. And to mount, and as I pointed out earlier, this unbelievably large-scale operation, which is unseemly in its own right, as far as I'm concerned, for us lawyers. But even if, regardless of that, to do that and take up all the time of the staff is clearly a breach of fiduciary duty. Well, as you point out, Bernstein essentially was a broker. Exactly. He brokered cases and apparently in his later years saw a reason to believe that the Med-Mal field was more lucrative for him. Exactly. And we pointed out quite clearly, Mr. Bernstein was well-known because he's been around for 65 years, as your Honor pointed out. So he knows the adjusters and could make money by some phone calls. We're not saying he was legally encamped, but he stopped doing it. And that was quite clear in the record because all of a sudden in 03 he made 200 grand because they did keep detailed records of who settled what cases. Now the next year he's down to 40 and then, oh, $500, $800. I mean, that is absolute clear proof that the plaintiff, Bernstein, decided to abandon Bernstein & Grazian and go to my malpractice case and interview all these clients and hope to make more money. So, yes, I agree with you, your Honor. He was thinking he'd make more money, and that's my point. That's a breach of fiduciary duty. And if you're going to breach fiduciary duty, you can't claim other details. That just doesn't wash. What's the bottom line on the cross-appeal as far as you're concerned? Well, I think it would be tough for other than to just deny him any money. I don't think he should get a dime. I think Justice Smith was correct in determining, I don't know for sure, I didn't look into Judge Mackey's mind, but I think exactly what Justice Smith said in terms of the where he came to the 10%. I respectfully disagree with Judge Mackey, very respectfully, but I respectfully disagree with him that here Mr. Bernstein should get nothing. Because he was the one that started all this. He decided to make more money in a competing venture. And a counsel says, we don't cite any case about Kwan and Merrowith into these facts. I don't think there is a case under these facts. I don't think there could be. Who would ever dream up that a lawyer that's duty-bound to a firm and has a fiduciary duty would haul off and spend, you know, five or six hundred grand for us competing for a separate law practice? It just doesn't wash. So I respectfully request that in terms of the cross-appeal, that there be a finding that there was against the manifest weight on breach of duty and take away the 10% and give Mr. Bernstein nothing. And I'm done unless the court has any other questions. Thank you. Thank you. The matter will be taken under advisement. She gets to... I thought you were going to put everything in one argument. No, she's going to... Come on. She's not going to give you the answer to that. First of all, thank you. It doesn't look like it's going well. Counsel says he mounted a massive business, a massive business. And we know this from the secretaries, and we know this from the amount of advertising. Not true. Not true. Actually, if you look at the defendant's own brief, page 14 and 15, in 2004, Grazian settled 121 cases resulting in fees to Bernstein and Grazian of $900,000. And in 2005, while this massive business is going on, Grazian settled 108 cases for fees of $843,000. So the business is going on just as fine as ever and maybe even better. I don't have the figures. They didn't put the figures in for what the firm earned earlier, but I tend to suspect that those were very good fees they were earning in those years. So the secretaries, as much as it was disruptive, they were doing everything they had to get done because the firm was doing just fine. We don't know about what the amount of advertising led to. We don't know if the evidence showed. The evidence didn't show that Bernstein made more from the medical malpractice. He may have hoped for it to make more, and he did refer a lot of cases out, but we don't know what he got from that. And so this is not accurate. There's also no proof in this record that Bernstein ever abandoned what he was doing because there's absolutely no proof that he stopped making phone calls to the adjusters. The only evidence is that he stopped getting money. And there's nothing in the record as to what was going on with the adjusters, how the adjusters felt. Maybe the old guys with whom Bernstein used to negotiate to settle a $5,000 case had retired. Maybe they were just gone and the new people weren't doing it. Maybe the industry changed where the insurance company said, we're not doing this anymore. We're not just making little sweetheart deals with this guy because we know him and we like him. We don't know. Bernstein never testified he stopped making phone calls. The evidence just was that he stopped bringing in money. And I know very close to my heart that that happens. It just happens, and everybody who's ever practiced law knows there are good years, there are bad years, and who knows why, but the man was getting older and older, as we all are, and he was over 90. So to say that there was something wrong with Bernstein getting any fees here to me is astonishing because Mr. Grazian was very happy with the arrangement for many years, even though nothing really changed, you know, in terms of what he did and what Bernstein did. So to say that now Bernstein shouldn't get anything because he really didn't know how to, he wasn't really a competent lawyer is baloney. He was as competent to do what he was doing at the end as he was in the beginning, and Grazian was very happy with it for many years, and if he wasn't happy, he should have left sooner. So that's all I have to say. Thank you. Thank you.